Raymond B. KELLER and Mary B. Keller, Plaintiffs-Respondents,

v.

Thomas J. MORFELD and Letha F. Morfeld, Defendants-Appellants.

Court of Appeals

*No. 97–3443. Submitted on briefs July 2, 1998.—Decided October 15, 1998.*

(Also reported in 588 N.W.2d 79.)

413

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Terence R. Collins* and *Cheryl M. Gill* of *Collins, Quillin & Knothe, Ltd.* of La Crosse.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *William P. Skemp* and *Sonja Davig Huesmann* of *William Skemp Law Firm, S.C.* of La Crosse.

Before Dykman, P.J., Eich and Deininger, JJ.

EICH, J.   Thomas and Letha Morfeld appeal from a summary judgment quieting title to a portion of their property in their neighbors, Raymond and Mary Keller. The Kellers maintained that, through the actions of their predecessor in title, Kenneth Thorson, they had acquired title to the land by adverse possession, and the trial court agreed.

The lots now owned by the Kellers and Morfelds were once part of a larger, single parcel owned by Kenneth Thorson. When Thorson purchased the property in the early 1950s, a tavern was located on the southern portion of the property and the rest was vacant. A few years later, an electric power line and security light were installed behind the tavern to the north, and, shortly thereafter, Thorson built a home on the northerly portion of the property, beyond the power line. Thorson then divided the property into two separate parcels, one containing the tavern and one the home. He stated in a deposition that, in dividing the property, he had intended that "[e]verything north of the power line was to belong to the home and [everything] from the [line] in a southerly direction was to belong to the [tavern]." The legal descriptions of the two parcels did not meet that intention, however, for the disputed area—which measures approximately 140 by 40 feet—is located north of the power line, but is included in the description of the "tavern" lot.

Thorson sold the tavern property in 1977, and continued to live in the house, treating the disputed land as part of the property belonging to the residential lot and using much of it for parking and storage of equipment and materials used in a siding business he operated from his home.

In 1987, Thorson sold the house to the Kellers, and they continued to treat the disputed land as part of the residential lot, planting trees and building a carport on it, and erecting a railroad-tie fence separating the lot from the tavern property. The tavern property, which had gone through various owners since its initial sale by Thorson, was purchased by the Morfelds in 1987.

In granting the Kellers' motion for summary judgment confirming their title to the disputed land, the trial court ruled that they, and their predecessor in title, Kenneth Thorson, had openly and exclusively occupied the disputed property "to the exclusion of the Morfelds and their predecessor in title—since the time the property was divided" in 1977.

We review summary judgments *de novo*, employing the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). The methodology is well established and need not be repeated here. *See State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 511–12, 383 N.W.2d 916, 917–18 (Ct. App. 1986). The parties agree that no material facts are in dispute, and the only issue is whether, as the trial court ruled, the Kellers are entitled to judgment as a matter of law. Section 802.08(2), STATS.

Persons seeking to establish title to property by adverse possession must show that they—and/or their

predecessors-in-title—have used the disputed property in a "hostile,[1] open and notorious, exclusive and continuous manner" for at least twenty years. *Leciejewski v. Sedlak*, 110 Wis. 2d 337, 343, 329 N.W.2d 233, 236 (Ct. App. 1982). *See also* § 893.25, STATS. And in calculating the twenty-year period, the adverse possession of predecessors in title may be "tacked on" to that of the present claimant. *Lindl v. Ozanne*, 85 Wis. 2d 424, 428, 270 N.W.2d 249, 251 (Ct. App. 1978). The Morfelds do not dispute the fact that the Kellers adversely possessed the disputed area after 1987. The only issue, then, is whether Thorson adversely possessed the property against the Morfelds' predecessors-in-title from 1977 to 1987.

This case presents an atypical situation in that the grantor (Thorson), whose adverse possession the Kellers seek to "tack on" to their own, was also the grantor to the Morfelds' predecessors-in-title. As a result, the Kellers must establish that Thorson's possession of the disputed property was adverse to that of the Morfelds' predecessors in title—with respect to whom Thorson was also a grantor. This relationship is significant in light of several nineteenth-century cases—notably *Schwallback v. Chicago, Milwaukee & St. Paul Ry. Co.*, 69 Wis. 292, 34 N.W. 128 (1887), suggesting that there is a common-law presumption that a grantor cannot possess adversely against his or her grantee. The *Schwallback* court stated, for example, that

---

[1] As we discuss in somewhat greater length below, *see* note 2, *infra*, in the context of an adverse possession case, the term "hostile" means only "that one in possession claims exclusive right to the land possessed." *Leciejewski v. Sedlak*, 110 Wis. 2d 337, 343, 329 N.W.2d 233, 236 (Ct. App. 1982).

417

whenever both parties claim title under the same person, neither of them can deny his right, and as between them the elder is the better title and must prevail; and hence . . . the estoppel of the grantor to deny his grantee's title arising from his deed, extends to all persons who claim from or under the grantor by title acquired subsequent to the grant whether by deed or otherwise. This must, at least, be so, presumptively.

*Id.* at 299, 34 N.W. at 131. The court went on to state that, to overcome the "presumption," the potential adverse claimant

must have the actual, exclusive occupation of the land . . ., or he must actually turn [the owner or competing possessor] out of possession. . . . To constitute a disseizin of the owner . . . by the entry and occupation of a party not claiming title to the land, the occupation must be of that nature and notoriety, that the owner may be presumed to know that there is a possession of the land adverse to his title . . . .

*Id.* at 299–300, 34 N.W.2d at 131. In other words, the claimant must prove the elements of adverse possession.

We quoted at length from *Schwallback* in *Lindl*, without explaining the "presumption" further, other than to state that it is rebuttable, and may be overcome by evidence of "open and notorious" adverse possession. *Lindl*, 85 Wis. 2d at 432, 270 N.W.2d at 453.[2]

---

[2] In *Lindl*, the claimant had built a fence marking the claimed boundary, and the fence had been in existence for decades. Additionally, the claimant had cultivated the land for several years and, more recently, had rented it to another farmer to raise crops. After discussing *Schwallback*, and similar cases of a similar vintage discussing "ouster" in terms of fences, or their lack, and in terms of use of the disputed parcel, we

The tautological result of the cases, then, is that the "presumption" against adverse possession in common-grantor cases may be overcome by evidence of adverse possession. It is thus not a presumption at all, but simply a matter of applying accepted principles of adverse possession to the situation where the opposing parties have taken their land from a common grantor, in the same manner as in any other case.

We thus consider whether the elements of adverse possession have been shown to exist with respect to the Kellers' claim. The Morfelds, arguing that they have not, claim that the *Schwallback* "presumption" still has some vitality: that adverse possession in the situation where the parties have taken their land from a common grantor will only be found where there is evidence of "words, actions or conduct that serve as an explicit declaration of hostility." Specifically, they refer to *Lindl*, where we quoted language from *Brinkman v. Jones*, 44 Wis. 498, 525 (1878), to the following effect:

> There would seem to be no good reason why the possession of a grantor may not be hostile to his deed, provided it be such as to give his grantee notice that he claims *in hostility to his grant*; nor why such *hostile possession* may not ripen into an adverse and perfect title, and bar the grantee from

concluded in *Lindl* that, because the claimant's fence had been regarded as the true boundary of the land for many years, and because his possession "was open and notorious and under a claim of right," it followed that "[t]he presumption against a grantor's adverse possession of land conveyed to his grantee was overcome by the [e]nclosure, cultivation and rental of the disputed parcel continuously from the time of the ... erection of the fence ...." *Lindl v. Ozanne*, 85 Wis. 2d 424, 432, 270 N.W.2d 249, 253 (Ct. App. 1978).

recovering . . . possession. . . . The cases . . . decide that a grantor may hold so adversely against his grantee. (Emphasis added.)

In *Lindl*, we found adverse possession based largely on the fact that the adverse claimant had built a fence separating the parcels. And they claim that the Kellers have done neither: they have not explicitly declared a hostile occupancy of the land, nor engaged in any use of the property that differs significantly from the manner in which it was used by Thorson.

*Lindl* did not hold, as the Morfelds maintain, that either "hostile" words or deeds or the erection of a boundary fence, are necessary to establish adverse possession against one who has taken title to the disputed land from a common grantor. The fence, in the *Lindl* court's view, was simply evidence of the claimant's "open and notorious" possession of the property, *Lindl*, 85 Wis. 2d at 432, 270 N.W.2d at 253—in other words, evidence of adverse possession. Nor does *Lindl* require, an "explicit declaration of hostility"—in the sense of aggressive or malicious conduct—to rebut the presumption. To the contrary, the *Lindl* court expressly recognized that adverse possession could arise "from the nature of the possession, without proof of an express declaration on the part of the occupant that he claimed to hold in hostility to his grant." *Id.* at 429, 270 N.W.2d at 252.[3]

---

[3] We note in this regard that the Morfelds appear to inflate the term "hostile," as it is used in the cases, to something it is not. The cases indicate that, in this situation, the term is not equated with any "deliberate, willful, [or] unfriendly animus." *Burkhardt v. Smith*, 17 Wis. 2d 132, 139, 115 N.W.2d 540, 544 (1962). Nor does it mean a manifestation of ill-will. *Shellow v. Hagen*, 9 Wis. 2d 506, 511, 101 N.W.2d 694, 697 (1960). Rather, an act is hostile in the context of an adverse-possession claim,

It is undisputed that Thorson, from the time he sold the tavern property in 1977 until he conveyed the residential lot to the Kellers in 1987, treated all property north of the power line—including the disputed area—as belonging to the residential property; and he used it to the exclusion of both his neighbors and the general public. Although his use of the area did not change appreciably after he sold the tavern, he did much more than merely "occupy or possess" it. He continued to use it as a parking lot and storage area, where he regularly parked his trucks and other vehicles, his trailer and his children's cars—and where he stored building materials and other equipment used in his siding business—until he sold the house to the Kellers in 1987. During this period, he continued to mow and maintain as his own a patch of lawn covering part of the disputed area.

The supreme court has held that using property for "the ordinary use to which the land is capable and such as an owner would make of it" in the usual course

when it is "inconsistent with the right of the owner and not done in subordination thereto." *Id.* It is an intention to "usurp the possession"—to claim exclusive right to property which one possesses physically, but not by record title. *Cusky v. McShane*, 2 Wis. 2d 607, 610, 87 N.W.2d 497, 499 (1958); *see also Burkhardt*, 17 Wis. 2d at 139-40, 115 N.W.2d at 544. To evince hostility in this sense, an adverse claimant must only do something which "clearly brings home to his [or her] neighbor the fact that he [or she] intends to claim the property against his [or her] neighbor and the world." *Cusky*, 2 Wis. 2d at 609, 87 N.W.2d at 499 (quoted source omitted). "If the elements of open, notorious, continuous, and exclusive possession are satisfied, the law presumes the element of hostile intent." *Burkhardt*, 17 Wis. 2d at 139, 115 N.W.2d at 544; *see also Leciejewski v. Sedlak, supra*, note 1.

of events—and in a way that indicates the boundaries of the adverse claim—provides sufficient notice of actual and exclusive adverse possession, *Burkhardt v. Smith*, 17 Wis. 2d 132, 138, 115 N.W.2d 540, 544 (1962); and we believe Thorson did just that.

Placement of "structural encroachments" on the land is not a requirement of adverse possession. "Any actual visible means[ ] which gives notice of exclusion from the property to the [record] owner or to the public and of the defendant's domination over it, is sufficient." *Id.* In this case, the undisputed evidence establishes that everyone having any dealings with, or proximity to, the property—including the Morfelds' predecessors-in-title—accepted the power line as the true boundary line between the two parcels. On Thorson's—and later, the Morfelds'—instructions, any snowplowing for the tavern did not extend north of the power line. Thorson, and later, the Kellers, paid the electricity bill for the security light on the power line pole, and tavern patrons were prohibited from parking north of the line. As to visual demarcation, Thorson testified that he believed a person could readily determine where the tavern parking lot ended and the residential property began because the tavern lot had a dark cinder base, while the parking area on the residential lot was covered with crushed rock. And the power line itself provided a "visible means" of demarcation between the two properties.

On this record, which establishes, among other things, that (a) Thorson used the disputed parcel of land exclusively and regularly, in an open and notorious manner—providing notice to both the Morfelds' predecessors-in-title, and to the public, (b) he claimed exclusive possession of the property, and (c) that the

power line was accepted by the Morfelds' predecessors in title and members of the public as marking the boundary between the two parcels, we conclude, as a matter of law, that any common-law "presumption," referred to in a few nineteenth-century cases, that a grantor may not adversely possess land conveyed to his grantee, has been rebutted—if it ever existed at all—and that the trial court properly granted the summary judgment determining that the Kellers had acquired title to the disputed area by adverse possession.

*By the Court.*—Judgment affirmed.